PAMPERIN RENTALS II, LLC, Pamperin Rentals III, LLC, Airport Shell, Inc., Brookside Shell, LLC, D/D Williamson, LLC, Grand Central, LLC and PJ's of DePere, LLP, Plaintiffs,

v.

R.G. HENDRICKS & SONS CONSTRUCTION, INC., Defendant-Appellant,†

ABC INSURANCE COMPANY, Red-D-Mix Concrete, Inc., AMCO Insurance Company and Nationwide Mutual Insurance Company, Defendants,

PEKIN INSURANCE COMPANY, Intervenor-Respondent.

Court of Appeals

*No. 2011AP2544. Submitted on briefs August 14, 2012.
—Decided October 10, 2012.*

2012 WI App 125

(Also reported in 825 N.W.2d 297.)

† Petition for Review Filed.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *April Rockstead Barker* and *Kurt A. Goehre of Liebmann, Conway, Oleniczak & Jerry, S.C.*, Green Bay.

On behalf of the intervenor-respondent, the cause was submitted on the brief of *Susan R. Tyndall* of *CMT Legal Group, Ltd.*, Waukesha.

Before Hoover, P.J., Peterson and Mangerson, JJ.

¶ 1. HOOVER, P.J.   R.G. Hendricks & Sons Construction, Inc., appeals a summary judgment dismissing Pekin Insurance Company from the action. The court concluded that Pekin's policy afforded no coverage for the claims asserted against Hendricks, and that Pekin therefore had no duty to indemnify or further defend Hendricks. Hendricks argues the policy does afford coverage. We disagree, and affirm.

## BACKGROUND

¶ 2.   This case arises from the construction of several service stations. Hendricks contracted to "prepare the site and supply and install concrete, stamped concrete, and colored concrete . . . ." Pamperin Rentals II, LLC and others (collectively, Pamperin) sued Hendricks, alleging the concrete Hendricks supplied and

671

installed "was defective and/or the work performed was not done in a workmanlike manner and has resulted in damages, including pitting and deterioration of the concrete, and will require replacement." Pamperin further alleged:

> That [Hendricks's] breach has and will cause the Plaintiffs damages, including, but not limited to, concrete and asphalt repair, all appropriate testing for the installation of replacement concrete, all incidental and consequential damages related to the tear-out and replacement of concrete and asphalt, business interruption and lost profits, and all incidental and consequential damages including contractual liabilities related to business interruption.

¶ 3.   Hendricks's insurer, Pekin, agreed to provide a defense, subject to a reservation of its right to later contest coverage. During discovery, Pamperin disclosed that only the concrete had suffered physical damage. The alleged business interruption and physical damage to asphalt were merely expected future harms to be incurred when the concrete itself was repaired or replaced.

¶ 4.   Pekin moved for summary judgment, arguing it had no duty to indemnify or further defend Hendricks because there was no policy coverage for Pamperin's alleged damage. Pekin argued there was no occurrence in the first instance and, additionally, the business risks exclusions applied to bar coverage. Specifically, Pekin argued exclusions k. and l. applied, which preclude coverage for damage to the insured's product and work, respectively. The court granted Pekin's motion, holding there was no occurrence. Hendricks now appeals.

## DISCUSSION

¶ 5.   The parties dispute whether Pekin has a duty to indemnify and further defend Hendricks. Where an insurer has provided an initial defense pending a final coverage determination, the "four-corners rule"— related to the duty-to-defend inquiry—is not implicated. *Olson v. Farrar*, 2012 WI 3, ¶ 34, 338 Wis. 2d 215, 809 N.W.2d 1. Instead, the court simply proceeds to a coverage determination. *Id.* The court may consider extrinsic evidence and, if there is no arguable coverage, determine on summary judgment that there is no duty to indemnify. *Id.*, ¶¶ 35–37. " 'The insurer's duty to continue to defend is contingent upon the court's determination that the insured has coverage if the plaintiff proves his case.' " *Id.*, ¶ 38 (quoting *Estate of Sustache v. American Family Mut. Ins. Co.*, 2008 WI 87, ¶ 29, 311 Wis. 2d 548, 751 N.W.2d 845). Thus, when a court concludes there is no duty to indemnify, the insurer is relieved of its duty to further defend the insured. *See also Elliott v. Baumann*, 2005 WI App 186, ¶¶ 9–10, 286 Wis. 2d 667, 704 N.W.2d 361.

¶ 6.   As relevant here, Hendricks's commercial general liability (CGL) policy affords coverage when an "occurrence" causes "property damage." The policy defines property damage as:

> a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

> b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

673

¶ 7. Hendricks argues both definitions apply here because, regardless of the alleged damage to Hendricks's own product or work,[1] Pamperin alleges physical injury to asphalt and plumbing, and loss of use of its stores and carwash bays. Hendricks fails to acknowledge, however, that no such physical injury or loss of use has happened. Thus, there is no "property damage" subject to coverage.[2]

---

[1] As discussed below, damage to Hendricks's own product or work is excluded from coverage. Hendricks's argument here is an alternative to its argument that the exclusions to coverage for Hendricks's product or work are inapplicable.

[2] We acknowledge that under the "property damage" definition, all loss of use of property that is not physically damaged is deemed to have happened at the time of the occurrence that caused it. Hendricks did not develop any argument based on this language in either of its briefs, despite Pekin's argument that there was no property damage because any such harm had not yet occurred. Rather, Hendricks merely states in passing in its reply brief that "[r]egardless of whether the damages are expressed as future or not, Plaintiffs are still seeking to hold Hendricks liable for such damages and the definition of property damage expressly provides for future resulting loss." We will not develop arguments for Hendricks, see *M.C.I. Inc. v. Elbin*, 146 Wis. 2d 239, 244–45, 430 N.W.2d 366 (Ct. App. 1988), and its failure to develop an argument in reply to Pekin's argument constitutes a concession, see *Charolais Breeding Ranches, Ltd. v. FPC Securities Corp.*, 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979).

In any event, Hendricks's proposed occurrence, the pitting and shaling of concrete, has not caused any alleged loss of use of the service stations. That is, there is no suggestion that the concrete's damaged condition has itself rendered the stations or carwashes inaccessible or unusable. See *Glendenning's Limestone & Ready Mix Co. v. Reimer*, 2006 WI App 161, ¶¶ 27, 30, 38–39, 295 Wis. 2d 556, 721 N.W.2d 704 (faulty workmanship in itself is not an occurrence, but it can give rise to an occurrence, which, in turn, causes damage to other property). Thus, because

¶ 8. Hendricks next contends there is policy coverage because Hendricks paid a separate premium for products—completed operations coverage. It asserts that, because this is therefore a separate, purportedly expensive, coverage, the business risks exclusions do not apply.

¶ 9. The policy structure and language do not support Hendricks's argument. The policy's common declarations page explains the policy is comprised of three parts: a CGL coverage part, a commercial inland marine coverage part, and a commercial property coverage part. This page also sets forth the premium for each part. The CGL coverage part declarations pages, in turn, specify multiple limits of insurance, including a "general aggregate limit (other than products—completed operations)" and a "products—completed operations aggregate limit," both of which are $2,000,000. These pages further break out the CGL coverage part's premium. Pekin charged $3,545 for the "premises/ operations" portion of the CGL coverage part and $594 for the "products/completed operations" portion.[3] Together, these charges match the premium specified for the CGL

___

there has been no loss of use caused by an occurrence, no loss of use has happened yet under the policy definition.

[3] The CGL coverage part declarations pages further explain that the premises/operations risk premium was figured by applying an 8.527 rate multiplier to a premium basis, and the products/completed operations risk premium resulted from a 1.430 rate multiplier applied to the same premium basis. Thus, both the rate multipliers and premium amounts demonstrate that the premises/operations risk portion of the coverage part is nearly six times more expensive than the products/completed operations risk portion. While the premium costs and relative cost are not directly relevant to our interpretation of the

coverage part as specified on the common declarations page.[4] In addition to the two-page declarations, the CGL coverage part includes an eleven-page CGL coverage form. This form contains all of the insurance provisions that are relevant here.

¶ 10. The CGL coverage form is divided into the following five sections: I – Coverages; II – Who is an insured; III – Limits of insurance; IV – Commercial general liability conditions; and V – Definitions. Section I is subdivided into the following three separate coverages: Coverage A. Bodily injury and property damage liability; Coverage B. Personal and advertising injury liability; and Coverage C. Medical payments. Each of the three coverages sets forth its own insuring agreement and contains its own set of exclusions.

¶ 11. Coverage A. indicates it covers liability for personal injury or property damage caused by an occurrence. Coverage A. includes numerous exclusions, several of which explicitly state they do or do not apply to the "products—completed operations hazard." As set forth above, there is no separate coverage identified specifically for products—completed operations. Thus, it is apparent that that risk is part of Coverage A. This is confirmed by Section V – Definitions, which explains that the " 'Products—completed operations hazard' includes all 'bodily injury' and 'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work' except: (1) Prod-

insurance contract, they provide context to Hendricks's claim that it purchased separate, expensive, and expansive coverage.

Our discussion focuses on the 2003 policy year documents. Subsequent policies contained different rate multipliers and/or premiums, but the proportion remained consistent.

[4] There is also a $25 premium factored into the CGL coverage part total, for a limited automobile coverage.

ucts that are still in your physical possession; or (2) Work that has not yet been completed or abandoned.

¶ 12. Thus, a plain reading of the policy reveals that it merely recognizes two types of property damage and personal injury risks—those arising from property or operations under the insured's control, and those arising from products or work over which the insured has relinquished control—and provides separate limits of coverage for each type of risk. The fact that the insured pays a separate (substantially discounted) premium for the (apparently diminished) risk of liability associated with products or work for which it has relinquished control does not dictate that the risk magically becomes a separate coverage grant with its own insuring agreement and set of exclusions. Rather, the products—completed operations hazard is plainly a component of Coverage A., which insures for bodily injury and property damage liability.

¶ 13. Hendricks asserts that the policy definition of "products—completed operations hazard" itself is an independent grant of coverage, subject to no exclusions or occurrence requirement. That interpretation is unreasonable at best. No reasonable insured would turn to the policy's definitions section, rather than the coverages section, to locate the grants of coverage. Moreover, the definition does not purport to define a coverage; instead, it defines a "hazard."

¶ 14. Hendricks also relies on *Robert E. Lee & Associates, Inc. v. Peters*, 206 Wis. 2d 509, 557 N.W.2d 457 (Ct. App. 1996). There, we held the policy's CGL pollution exclusion did not apply to products—completed operations coverage. *Id.* at 526. That case, however, involved an altogether different insuring agreement. We explained:

677

Coverage A and the CGL products/completed operations form appear in separate sections of the insurance policy. Although the CGL products/completed operations clause contains a long list of its own exclusions, some of which are identical to those in Coverage A's absolute pollution exclusion, it does not contain its own pollution exclusion clause. If the exclusions in Coverage A were intended to apply to the other policy provisions, it is unlikely that Integrity would reiterate the same exclusions in the CGL products/completed operations clause.

*Id.* The policy in *Robert E. Lee* contained both a CGL coverage form similar to the one at issue here and a separate, eight-page "Products/Completed Operations Liability Coverage Form," with its own coverage grant, exclusions, definitions and conditions. *See id.*; University of Wisconsin Law Library Wisconsin Briefs archive, http://libcd.law.wisc.edu/~wb_web/will0039/3b9b40df. pdf, Ex. G 8–15, 30–38 (last visited Oct. 3, 2012).[5] Thus, *Robert E. Lee* has no bearing on this case.[6]

¶ 15. Coverage A.'s business risk exclusions— exclusions k. and l.—if applicable, plainly exclude coverage for damage to Hendricks's products or completed

---

[5] The policy in *Robert E. Lee & Associates, Inc. v. Peters*, 206 Wis. 2d 509, 557 N.W.2d 457 (1996), utilized Insurance Services Office (ISO) forms dated 1985, 1988 for the products— completed operations form and dated 1982, 1984 for the CGL form. Here, Pekin's CGL form utilizes an ISO form dated 1992.

The *Robert E. Lee* policy is located in the appellant's appendix in that case. In lieu of the above direct link, the document may be searched for by the case citation at http://library. law.wisc.edu/eresouorces/wibriefs/.

[6] Moreover, the products—completed operations form in *Robert E. Lee* included the very business risk exclusions at issue here. Thus, had the issue arisen, the exclusions would have applied there as well.

work, i.e., the damaged concrete.[7] For this reason, and because there is no other alleged "property damage," the policy provides no arguable coverage, and Pekin has no duty to indemnify or further defend Hendricks.

¶ 16.  Hendricks alternatively argues the policy provides coverage for the alleged property damage under Coverage B. for personal injury liability. The policy defines personal injury as "injury, other than 'bodily injury' arising out of one or more of" five enumerated categories of offenses, including false arrest, malicious prosecution, and wrongful eviction. Citing *Liebovich v. Minnesota Insurance Co.*, 2008 WI 75, 310 Wis. 2d 751, 751 N.W.2d 764, Hendricks argues there is coverage because Pekin omitted a comma after the phrase "bodily injury." The kindest way to treat this argument is to pretend it was never made. Suffice it to say, *Liebovich* involved a different type of policy with different language.

¶ 17.  Finally, Hendricks argues Pekin forfeited its right to disclaim its duty of defense because it waited too long to do so and it failed to notify Hendricks that it was entitled to hire its own attorney at Pekin's expense. Hendricks's argument relies primarily, if not entirely, upon *Maxwell v. Hartford Union High School District*, 2010 WI App 128, 329 Wis. 2d 654, 791 N.W.2d 195, *rev'd*, 2012 WI 58, 341 Wis. 2d 238, 814 N.W.2d 484.

---

[7] Hendricks asserts the exclusions would not apply if the damage to the concrete did not arise from Hendricks's faulty workmanship. That is true; it is also irrelevant. Pamperin alleges Hendricks's faulty workmanship caused the damage to the concrete, and if that is not true, then Pamperin has no basis for holding Hendricks liable in the first place. If a child leaves her properly constructed jump-rope on her neighbor's lawn and the rope is damaged by a lawnmower, is the jump-rope manufacturer liable to repair or replace it?

¶ 18.   Following submission of the briefs in this case, Hendricks notified us of the subsequent decision reversing *Maxwell*. Hendricks indicated it had cited Maxwell "for the proposition that an insurer's unreasonable delay in contesting coverage precludes it from denying its duty to defend an insured," and that it "hereby withdraw(s) its reliance on *Maxwell* ... and any argument in its briefs related thereto." Absent further explanation or limitation, we deem Hendricks's notice as a withdrawal of its entire argument. In any event, we observe Hendricks conceded that Pekin did not provide a mere token defense, and Hendricks therefore suffered no prejudice.

*By the Court.*—Judgment affirmed.